UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL VERNELL YOUNG                         CIVIL ACTION

VERSUS                                        NO. 19-13516

JAMES LEBLANC ET AL.                          SECTION "T"(2)

## REPORT AND RECOMMENDATION

Plaintiff, Michael Vernell Young, is currently incarcerated in the B.B. "Sixty" Rayburn Correctional Center ("Rayburn") in Angie, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 ("Section 1983") against defendants James LeBlanc, Robert Tanner, Tim Crawford, Kevin Luper, Andria Johnson, Suzanne Sheridan and Keith Bickham.

Plaintiff claims generally that he was given a false disciplinary report on June 26, 2019, which resulted in his conviction on false charges without evidence; that he received an inadequate written disposition of his charges; and that false statements were given to uphold the conviction on appeal. Record Doc. No. 1 (Complaint at ¶ IV). He seeks monetary damages against LeBlanc, Luper, Johnson, Crawford and Sheridan and an injunction ordering his release from "extended lockdown." Id. at ¶ V.

On January 14, 2020, I conducted a telephone conference in this matter. Participating were plaintiff, pro se; and Angela O'Brien and Kristian Dobard, counsel for defendant LeBlanc. Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction and two Motions for Summary Judgment, Record Doc. Nos. 10, 14, 27, which were automatically referred to me for report and recommendation. Local Rule 73.2(A). Plaintiff's first motion for summary judgment, Record Doc. No. 14, was stricken from the record at his request. Record Doc. No. 33. Defendant LeBlanc filed an opposition memorandum to the Motion Temporary Restraining Order and Preliminary Injunction and the first Motion for Summary Judgment, in which he argues that <u>he</u> is entitled to summary judgment. Record Doc. Nos. 18, 26. Plaintiff filed a response to LeBlanc's opposition to his motion for summary judgment. Record Doc. No. 38. Defendants Bickham, Crawford, Luper and Tanner filed a Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction, Record Doc. No. 34, which was also automatically referred to me for a report and recommendation, Local Rule 73.2(A), and plaintiff filed an opposition memorandum, Record Doc. No. 44. These motions are addressed in this report.

## **THE RECORD**

### (1)    PLAINTIFF'S COMPLAINT

In his complaint, plaintiff alleges that on June 20, 2019, he "was in his dorm . . . Snow 3. . . changing a trash bag when defendant Johnson . . . placed me in handcuffs and placed me in Administrative Segregation for [violations of] . . .  Rule #30D (General prohibited behavior), Rule #3 (Defiance) and a [R]ule #5 (Aggravated Disobedience)." Record Doc. No. 1. at pp. 10–11. Young claims that he was written up for these charges by "a cadet, now ex[-] employee, Rachael Smith. . . . [who] said that I approached her and attempted to engage in

2

a non professional (sic) relationship by asking her [if] she like[d] her job." <u>Id</u>. at p. 11. Plaintiff alleges that "she gave no location of the place I [allegedly] approached her but in box 5 of the rule violation she only put[] Snow unit as [the] place of incident." <u>Id</u>. He states that the officer "also placed the time of [the] incident at approx[imately] [4:00 o'clock] p.m. . . . but [that time] is right after count time and . . . [during that time] inmates [are] let out [of] the dorms [if they are] kitchen workers and I do not work in the kitchen." <u>Id</u>. Plaintiff alleges that the officer was working in a different dorm, "Snow 1 and . . . 2," and he would have had to go to that dorm, but no camera footage shows him leaving. <u>Id</u>. Young claims that if he had left his dorm, he would have been caught on the camera footage and would have been written up for a "[R]ule #24 unauthorized area [violation]." <u>Id</u>.

Plaintiff states that on June 24, 2019, he "went before defendant[s] Crawford and . . . Sheridan concerning the . . . disciplinary report. . . . Within this hearing I made a motion to have the camera reviewed . . . My motions were granted and it was seen that I never went [any]where around this officer. Both hearing officers agreed and stated on record that 'although the[re] is no camera footage of the incident . . . I need a better defense.'" Record Doc. No. 1 at pp. 11–12. Plaintiff claims that he was "found guilty by both defendants [of the Rule 3 and 30D charges] without any evidence of ever being around this officer." <u>Id</u>. at p. 12. He states that the Rule 5 charge was dropped. <u>Id</u>. Young alleges that because that charge was dropped, the others should have been as well, because that charge was "the foundation of the whole case." <u>Id</u>.

Plaintiff states that he appealed "the sentence of transfer to extended lockdown level two for 90 days . . . , [and his] appeal was given to defendant Luper by defendant Tanner." Id. at p. 13. He claims that by this time, the reporting officer had been fired and that when "Luper investigated . . . [he] asked defendant Johnson (who had nothing to do with the report nor did she have knowledge about this incident . . . ), and [she] told . . . Luper that the incident happened outside. . . . [a]lthough the reporting officer never made any statement about this incident happening outside." Id. Young alleges that based on this statement, Luper denied his appeal. Id. Plaintiff states that he then "went on hunger strike and suicide watch trying to protest the sentence." Id. at p. 14. He claims that once he found out that the original reporting officer had been fired, he "contacted Warden Tanner, Bickham and Anderson, [as well as] Luper and talked . . . with both . . . Luper and Johnson at different times." Id. He states that he offered to pay for a polygraph test. Id.

Young alleges that he went on suicide watch on August 22, 2019 until October 11, 2019, because "I have los[t] contact with my family and friends, my chances to make parole and earn good time has been affected by this unlawful confinement." Id. He claims that while on suicide watch, he talked to Johnson "and she said [that the] only reason she stated anything about outside to defendant Luper was because she thought that is what the write up said. After reviewing the write up she told me she talked to defendant Luper about the mix up but Luper didn't say anything." Id. He alleges that Luper came by his cell and said "'it is not going away remember all those times you were sentenced to extended but let out well it has come back to bite you.' He was referring to when defendant Crawford was sentencing

4

me to extended [lockdown] but due to me having a lawsuit concerning extended lockdown
. . . , Tanner was keeping me out [of lockdown] to get the case dismissed as moot." Id. at pp.
14–15. He states that Bickham confirmed that plaintiff "was being paid back for all the times
they let me out of extended [lockdown] due to my other lawsuit." Id. at pp. 16–17. Plaintiff
states that "the lawsuit I had was dismissed as moot because . . . Tanner kept me out [of] the
block tricking the court." Id. at p. 17. He alleges that he was put in lockdown "to get back
at me for filing suit against them which is my right." Id.

Plaintiff claims that he then appealed to defendant LeBlanc, who denied his appeal.
Id. at p. 15. He alleges that LeBlanc "read Luper's appeal decision which stated he had
checked the Snow walk camera but was unable to know for sure if that was me or the video
. . ., [which] should have given . . . LeBlanc pause . . . [and] reasonable doubt [about the lack
of evidence]." Id. at p. 16. He states that he then wrote "Tanner but he never wrote me back.
[S]o I [filed] an ARP ["Administrative Remedies Procedure"] . . . because Tanner[,] Luper
and Johnson lied on my disciplinary appeal by giving false statements and upholding the
false confinement. Warden Bickham reject[ed] my ARP," which plaintiff alleges denied him
access to the courts. Id. at p. 16.

He stated that after he went off suicide watch, he "wrote Warden Bickham trying to
get him to see that the reporting officer said nothing about the incident happening outside and
he wrote me back confirming that there is no record of anything about outside in his record
from the reporting officer but he did what defendant LeBlanc did and spoke about statements
I supposedly made . . . ." Id. at p. 17.

Plaintiff alleges that as a result of these alleged violations, he has "los[t] contact with my son, my father, my sister [,] . . . my girlfriend and other family and friends. Extended lockdown offenders can only use the phone once a week for those not on cell confinement but due to rule violations in connection with the current civil action I received cell confinement for asking to be placed on suicide watch so I have not talked to my family in months." Id. at pp. 17–18. He claims that "while on extended lockdown inmates are not allowed to order or receive free books, magazines[,] newsletters, etc. Our food is served cold because the food comes on a wagon and the kitchen is far away from Sun unit where I'm housed, [and] the food is inspected for contraband [and the]. . . orderlies take their time getting the food to us." Id. at p. 18. Plaintiff alleges that he wrote defendants Tanner and Bickham but nothing was done. Id. Young claims that the "cells and whole tier are filled with bugs . . . [and] [w]hen it's cold the officers keep the fans on and the vents but do not put the heaters on." Plaintiff alleges that he has been in lockdown for 180 days, rather than the 90 to which he was sentenced, and that defendants do not care about his mental issues in isolated confinement. Id.

    (2)    JANUARY 14, 2020 TESTIMONY

Young testified that he is presently incarcerated in Rayburn based on a conviction for distribution of crack cocaine on November 13, 2013. He stated that he is serving a ten-year sentence, with an anticipated good time release date in 2022 and full-time release date in 2023. He confirmed that he has two general claims in this lawsuit: (1) he was improperly convicted of false disciplinary charges without evidence of his guilt; and (2) defendants

brought disciplinary charges against him in retaliation for his filing of a previous federal lawsuit regarding his First Amendment rights.

Plaintiff stated that on June 20, 2019, he was charged with three disciplinary violations. He said that he was in the dorm dumping garbage for an unnamed prison officer when defendant Andria Johnson came in and told him to "come walk with her." He testified that at that time Johnson was a captain at the prison, but she has since been promoted to major. Young said that ". . . everybody knows that when [Johnson] comes to get you, she's going to lock you up." He stated that he went with Johnson so he would not get into any more trouble. Plaintiff testified that he was put into administrative segregation and was written up for violations of Rule 30D (general prohibited behavior, attempting to or establishing a relationship with a correctional officer), Rule 3 (defiance) and Rule 5 (aggravated disobedience). He said that prison officials gave him a written statement of his charges on June 20, 2019.

Young testified that he went before defendants Tim Crawford and Suzanne Sheridan for a disciplinary hearing on June 24, 2019. He said that he testified at the hearing that he never was around or spoke to the reporting officer, Cadet Rachael Smith, as she was not around his dorm and that it was her first day working. He stated that she was fired two weeks later because she was not supposed to be working at the prison because she lacked a proper license. Plaintiff testified that the charge was that he approached Smith and asked her if she liked her job, she told him to stop asking personal questions and that plaintiff told her she had

a bad attitude and he "was gonna fix her bad attitude" and that he hoped they would put her "on my dorm." He said that he "never talked to that lady a day in my life, ever."

Young testified that at the disciplinary hearing he made a motion to review the prison cameras, which are "all over" Rayburn, in hopes of exonerating himself. He said Crawford and Sheridan reviewed the surveillance camera footage and said that "although there's no camera footage [that depicts his involvement in] the incident," that did not help him, and he needed a "better defense." He testified that he also made a statement on his own behalf at the hearing that he "never was around this woman." He said that he was at his bunk at the time of the incident, and the only people outside of the dorms at the time were kitchen workers. Plaintiff stated that he is legally handicapped and cannot use his right side because of nerve damage, so he is "idle" and has no job at all, is in the dorm all day and is not a kitchen worker; thus, if he was anywhere outside of the dorm, he would have been written up for a Rule 24 (unauthorized area) violation. Plaintiff said he was in his bed during the time of the incident. He stated that he was nowhere around the officer during the time of the incident, and that no other evidence was submitted at the hearing other than the statement and camera evidence.

Plaintiff testified that the hearing resulted in dismissal of his Rule 5 charge and a guilty verdict on the Rule 3 (defiance) and 30D (general prohibited behavior) charges. He stated that he was sentenced to Level 2 extended lockdown for 90 days and was placed in lockdown on June 24, 2019. Young explained that Level 2 means that the inmate is put in a two-man cell, cannot go to good time classes or parole hearings, and must remain in his cell

all day. He elaborated that while in Level 2 lockdown an inmate cannot earn good time credits, his phone use is limited, he cannot receive outside publications or attend church services and has no access to similar privileges otherwise available to prisoners. Plaintiff said that while in Level 2 lockdown inmates are subject to cold food and other "bad conditions," including bugs in the cells. He testified that the officers keep the fans and vents on constantly, do not turn the heat on when the temperature is cold and tamper with the inmates' mail. Young testified that while he is now on Level 1 lockdown, he was on Level 2 lockdown for more than 90 days. He stated that after 90 days had expired, he went before a cellblock review board, consisting of Donnie Fields and Kimberly Ryan, who decided to keep him on Level 2 lockdown due to his original charges.

Young testified that he went on a hunger strike from June 24 to July 4, 2019, to protest his situation and demanded to speak to the warden. Plaintiff stated that he was placed on suicide watch from August 22 (60 days into his Level 2 lockdown) to October 11, 2019. He stated that though he told prison officials that he was suicidal and wanted to talk to a social worker, he did not attempt suicide. Young testified that he received no other write-ups during lockdown.

He said that he appealed his convictions to Warden Robert Tanner, who gave the appeal to Luper for review, and that Luper denied his appeal. Young stated that Tanner and Luper went to defendant Johnson about the charges, because by the time the appeal was ongoing, the reporting officer had been fired. He said that Johnson made up a story about a situation that "happened outside." He testified that Luper reviewed the outside camera

9

footage and said that he could not be sure that plaintiff was the person approaching the reporting officer because the image was unclear, but that he had no reason to doubt the reporting officer. Plaintiff stated that this conviction was upheld on appeal. Young testified that he then appealed to [LeBlanc], who only "made statements about the Rule 3" defiance charge. He stated that his appeal was denied and he made no further appeals.

Young stated that Johnson told him that she tried to talk to Luper, who did nothing. He said that Johnson told him that the only reason she said what she did is that she thought her statement matched what the reporting officer said. He testified that her statement was the reason Luper uphold his conviction on appeal.

Plaintiff confirmed that his retaliation claim was based on disciplinary action for filing a previous lawsuit in this court. That lawsuit, C.A. No. 18-6624, was dismissed as moot by the presiding judge. He testified that Tanner "kept him out of extended lockdown to get the case dismissed." Young stated that after the case was dismissed on May 12, 2019, he was placed in lockdown in June 2019. Plaintiff testified that defendant Crawford sentenced him to Level 2 extended lockdown, where he was not able to receive books, magazines or outside materials. Young stated that when he asked Luper about him speaking to Johnson, Luper laughed at him and said that "it was not going nowhere, and that [extended lockdown] was payback [for filing the lawsuit]." He testified that during his hunger strike, Bickham came and told Young that he was in lockdown because he filed the lawsuit. Young stated that defendants filed the disciplinary charges against him that resulted in him being placed in lockdown because he filed the lawsuit.

(3)    <u>PLAINTIFF'S DECLARATION</u>

On March 27, 2020, plaintiff filed a declaration that complains about incidents that have occurred beginning on February 16, 2020, <u>after</u> the events about which he complains in this lawsuit.[1] Record Doc. No. 45. Plaintiff claims that, "on February 16, 2020, I made [a] sick call by filling out a health care request form complaining about having a cold or fever because the officers put the vents on while it is already cold [and] have the fans going 24 hours a day." <u>Id</u>. at p. 1. Plaintiff asserts that the officers keep it cold to try and force inmates off of suicide watch. <u>Id</u>. He claims that he was "coughing, sneezing, [and had a] running nose [and] sore throat." <u>Id</u>.

Young alleges that ". . . Ms. Karen . . . the nurse who did the screening . . . did not order any medications but noted on the health care form paper that I was sick." <u>Id</u>. at p. 2. He claims that the nurse "is involved on a personal level with one of the officers that works on the extended lockdown unit, [and] . . . due to me putting the statements about the officers on the form. . . [, she] asked which officers are [keeping the vents on and the temperature low]." <u>Id</u>. Plaintiff states that he said that "every shift is doing [it] . . . you can look down the tier and the fans are on and you can hear the vents" after which Nurse Karen said that he could be taken back to his cell. Plaintiff states that because the nurse did not give him any medication he made a second sick call on "February 17, 2020[,] when she was not working.

_____

[1] Some of the claims plaintiff makes in his declaration relate to claims originally asserted in his complaint, and those claims have been addressed in this report. As to those unrelated to the claims contained in his complaint, plaintiff may either move to amend his complaint or file a new lawsuit asserting those claims.

[Emergency Medical Technician] Rester came and I presented the same facts of my illness and he ordered me medication." Record Doc. No. 45 at p. 2.

Young claims that "Rayburn prison officials['] ongoing retaliation has made me be in extended lockdown for nine months when the disciplinary board only sentenced me to 90 days." Id. at p. 5. He states that "[c]omparing [g]eneral population with . . . extended lockdown shows [that] the extended lockdown conditions impose an atypical and significant hardship on me [because] the general population is open dorms, [and while in general population]. . . I'm able to walk to chow to get my meals, talk to other prisoners, use the phone everyday and all day if I like, watch tv, go on the rec yard, take self help classes like the one I was already enrolled in before I was placed in extended [lockdown], send instant letters to my family via email on jpay and go to my parole hearing . . . extended [lockdown] stops all Louisiana prisoners from making parole." Id. at p. 6.

## I.    STANDARDS OF REVIEW

In addition to the summary judgment and temporary restraining order/preliminary injunction standards discussed below, the following legal standards apply to plaintiff's claims and defendants' motions as an initial matter.

### (A)    SCREENING

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been filed in forma pauperis. 28 U.S.C. § 1915A(a); Thompson v. Hicks, 213 F. App'x 939, 942 (11th Cir. 2007); Lewis v. Estes, 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir. 2006); Shakur v.

12

Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin v. Scott, 156 F.3d 578, 579–80 (5th Cir. 1998); Lewis v. Sec'y, DOC, 2013 WL 5288989, at *2 (M.D. Fla. Sept. 19, 2013), aff'd, 589 F. App'x 950 (11th Cir. 2014). Such complaints by prisoners must be dismissed upon review if they are frivolous, fail to state a claim upon which relief can be granted, or seek monetary relief for a defendant who is immune. 28 U.S.C. § 1915A(b)(1) and (2); Lewis, 589 F. App'x at 952; Thompson, 213 F. App'x at 942; Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended). A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. Spears, 766 F.2d at 180. "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to

13

many prisoners." Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25, 112 S. Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents. " Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).

After a Spears hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly

does not exist.'" <u>Davis</u>, 157 F.3d at 1005 (quoting <u>McCormick v. Stalder</u>, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." <u>Moore</u>, 976 F.2d at 269. A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

    (B)    <u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND FOR LACK OF SUBJECT MATTER JURISDICTION</u>

Fed. R. Civ. P. 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted. The Supreme Court recently clarified the standard for a motion to dismiss under Rule 12(b)(6):

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."

<u>Harold H. Huggins Realty, Inc. v. FNC, Inc.</u>, 634 F.3d 787, 796 (5th Cir. 2011) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007))).

"The Supreme Court's decisions in <u>Iqbal</u> and <u>Twombly</u> . . . did not alter the long-standing requirement that when evaluating a motion to dismiss under Rule 12(b)(6), a court

must 'accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." Id. at 803 n.44 (quoting True v. Robles, 571 F.3d 412, 417 (5th Cir. 2009)) (internal quotation omitted).

The Rule 12(b)(6) analysis is generally confined to a review of the complaint and its proper attachments. Walch v. Adjutant Gen.'s Dep't, 553 F.3d 289, 293 (5th Cir. 2008). Defendants' motions address only the sufficiency of the allegations of the complaint as a matter of law, not whether the allegations are true. Thus, for purposes of these motions, the court accepts "all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiffs.'" Jabary v. City of Allen, 2013 WL 6153241, at *3 (5th Cir. Nov. 25, 2013) (quoting Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008)). "With respect to any well-pleaded allegations 'a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 664). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Maloney Gaming Mgmt., L.L.C. v. St. Tammany Parish, 456 F. App'x 336, 340 (5th Cir. 2011) (quotations omitted) (citing Iqbal, 556 U.S. at 696; Elsensohn v. St. Tammany Parish Sheriff's Ofc., 530 F.3d 368, 371 (5th Cir. 2008); In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 n.10 (5th Cir. 2007)).

As to defendants' motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1) requires dismissal of an action if the court lacks jurisdiction over the subject matter of the plaintiff's claim. Motions brought under Rule 12(b)(1)

> allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist.

Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted); accord Randall D. Wolcott, M.D., P.A. v. Sebelius, 635 F.3d 757, 762–63 (5th Cir. 2011); Johnson v. Aramco Servs. Co., 164 F. App'x 469, 470 (5th Cir. 2006).

A Rule 12(b)(1) motion should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. Venable v. La. Workers' Comp. Corp., 740 F.3d 937, 941 (5th Cir. 2013); Davis v. United States, 597 F.3d 646, 649 (5th Cir. 2009). A motion to dismiss under Rule 12(b)(1) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6). In re Mirant Corp., 675 F.3d 530, 533 (5th Cir. 2012); Lane v. Halliburton, 529 F.3d 548, 557 (5th Cir. 2008).

Applying the foregoing standards in this case, **IT IS RECOMMENDED** that plaintiff's motions, Record Doc. Nos. 10 and 27, should be **DENIED**; that defendants' motion to dismiss for lack of subject matter jurisdiction and/or for failure to state a claim, Record Doc. No. 34, should be **DENIED IN PART** as to subject matter jurisdiction and

**GRANTED IN PART** as to failure to state a claim; that defendant LeBlanc's request for summary judgment, Record Doc. No. 26, should be **DISMISSED WITHOUT PREJUDICE**; and that plaintiff's complaint as a whole against all defendants should be **DISMISSED WITH PREJUDICE** under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as legally frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims, or pursuant to Heck v. Humphrey, 512 U.S. 477 (1994), all for the following reasons.

II.    ANALYSIS

(A)    FALSE DISCIPLINARY CHARGES CLAIMS

Young's claims that his constitutional rights were violated based on false or fabricated disciplinary charges resulting in his placement in extended lockdown and the inability to earn good time credit are legally frivolous, fail to state a claim of violation of his constitutional rights and must be dismissed.

In Sandin v. Connor, 515 U.S. 472, 481–83 (1995), the United States Supreme Court held that analysis of a prisoner's due process claim relating to his placement in lockdown or other denial of prison privileges as disciplinary punishment begins with determining whether a constitutionally protected liberty interest exists. "Liberty interests protected by the Fourteenth Amendment may arise from two sources–the Due Process Clause itself and the laws of the States." Hewitt v. Helms, 459 U.S. 460, 466 (1983). In Sandin, the Supreme Court recognized that, although the States may create liberty interests, "these interests will generally be limited to freedom from restraint which . . . imposes atypical and significant

18

hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 484 (citations omitted). Thus, in <u>Sandin</u>, when a prisoner was placed in disciplinary segregation for 30 days and the placement did not inevitably affect the duration of his sentence, the Court held that due process does <u>not</u> require that a prisoner be afforded the procedural mechanisms previously prescribed in <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974), and <u>Hewitt</u>, 459 U.S. at 460.

In addition, the Supreme Court intimated in <u>Sandin</u> that prison disciplinary proceedings resulting in the loss of good time credit may result in an "atypical and significant hardship" implicating due process concerns because they affect the duration of the inmate's imprisonment. <u>Sandin</u>, 515 U.S. at 479–84. Without specifically addressing <u>Sandin</u>, the Fifth Circuit held in a case involving the Texas good time statute that prison disciplinary action that results in an inmate's loss of good time credit must be accompanied by certain procedural safeguards of the type described in the pre-<u>Sandin</u> Supreme Court decision in <u>Wolff</u>. <u>Hallmark v. Johnson</u>, 118 F.3d 1073, 1080 (5th Cir. 1997). Similarly, in <u>Madison v. Parker</u>, 104 F.3d 765, 768 (5th Cir. 1997), the Fifth Circuit stated that a prisoner's "loss of 30 days good time credit calls for a more careful analysis" of applicable due process principles.

In <u>Wolff</u>, the Supreme Court held that because disciplinary proceedings are not part of a criminal prosecution, the prisoner need not be afforded "the full panoply of rights" provided in criminal proceedings. 418 U.S. at 556. Nevertheless, the <u>Wolff</u> Court held that prison officials must afford the prisoner <u>some</u> due process in disciplinary proceedings before

imposing punishment, including notice of the violation, a hearing and some opportunity to present evidence on the prisoner's behalf. Id.

"[T]he Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner." Madison, 104 F.3d at 767. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." Wilkinson v. Austin, 545 U.S. 209, 225 (2005) (citations omitted). The Fifth Circuit held in Madison that a prisoner's 30-day commissary and cell restrictions imposed as punishment for disciplinary violations were "merely changes in the conditions of his confinement and do not implicate due process concerns." Madison, 104 F.3d at 768; accord Hernandez v. Velasquez, 522 F.3d 556, 563 (5th Cir. 2008); Dixon v. Hastings, 117 F. App'x 371, 372 (5th Cir. 2005); Malchi v. Thaler, 211 F.3d 953, 957–58 (5th Cir. 2000). In Hernandez and Madison, the Fifth Circuit held that such restrictions do not represent the type of atypical, significant deprivation in which a state might create a liberty interest. Hernandez, 522 F.3d at 563; Madison, 104 F.3d at 768. Some examples of prison hardships that would qualify as so atypical and significant as to implicate due process considerations include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital or extension of the prisoner's sentence for his underlying criminal conviction. Sandin, 515 U.S. at 484.

In the instant case, Young's testimony and written submissions establish that the actions taken against him based upon the allegedly false disciplinary charges and resulting

hearings were that he remained in extended lockdown in Level 2 and was unable to earn good time credit during that time. It is well established that the imposition of extended lockdown does not constitute such an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" that particular forms of process of the type described in Wolff were required. Sandin, 515 U.S. at 484; Madison, 104 F.3d at 768; Johnson v. Livingston, 360 F. App'x 531, 532 (5th Cir. 2010) (citing Malchi, 211 F.3d at 958); Hernandez, 522 F.3d at 563; Dixon, 117 F. App'x at 372.

In addition, the case law is clear that an inmate's allegation that a prison official asserted false disciplinary charges against him fails to state a claim under Section 1983 when the prisoner is afforded due process protection through a subsequent hearing. Harris v. Smith, 482 F. App'x 929, 930 (5th Cir. 2012) (quoting Collins v. King, 743 F.2d 248, 253–54 (5th Cir. 1984)); accord Doolittle v. Holmes, 306 F. App'x 133, 134 (5th Cir. 2009); Moore v. Butler, 211 F.3d 593, 2000 WL 329165, at *1 (5th Cir. Mar. 17, 2000).

On the other hand, "a forfeiture of 'good time' credit . . . normally prevents a due process claim from being foreclosed by Sandin" because it affects the quantity, rather than the quality, of time served. Collier v. Dunaway, 2008 WL 4809467, at *2 (E.D. La. Oct. 31, 2008) (citing Madison, 104 F.3d at 768; Bean v. McConnell Unit, 2006 WL 2346295, at *3 (S.D. Tex. Aug. 11, 2006)). Nonetheless, Young's due process claims regarding his disciplinary proceedings and resulting loss of opportunity to earn good time credit must be dismissed at this time for three reasons.

First, to pass constitutional muster, a prison disciplinary decision must be based only on "'some evidence' to show that the inmate committed the offense in question." Dempsey v. Cain, 2010 WL 3081527, at *6 (M.D. La. July 8, 2010), report and recommendation adopted, 2010 WL 3081737 (M.D. La. Aug. 5, 2010) (quoting Superintendent, Massachusetts Correctional Institution v. Hill, 472 U.S. 445 (1985)). "The some evidence standard is extremely deferential, and thus, ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence[.] . . [T]he relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. Id. (quotations omitted); see Morgan v. Dretke, 433 F.3d 455 (5th Cir.2005). "Indeed, even if the evidence is meager, so long as there is some evidence to support the findings of the disciplinary board, the board's decision must be upheld. Id. (quotations omitted).

The Fifth Circuit has held that an incident report written by an officer with firsthand knowledge, standing alone, constitutes evidence sufficient to support a disciplinary determination of guilt. Hudson v. Johnson, 242 F.3d 534, 536–37 (5th Cir.2001) (an incident report written by officer with first hand knowledge, standing alone, constituted "some evidence" to support prison disciplinary board's finding of guilt); Coleman v. Dretke, 2006 WL 929320, at *2 (N.D. Tex. Apr. 11, 2006) (citing Hudson, 242 F.3d at 536-37). Attached to plaintiff's complaint is the original disciplinary determination, which contains a summary of the reporting officer Cadet Rachael Smith's report. Record Doc. No. 1-1 at p. 1. The disciplinary determination explicitly relies on her account in adjudicating plaintiff guilty of

the stated rule violations. Id. In addition, LeBlanc's appeal decision notes that he relied on the disciplinary report and the reporting officer's eyewitness account in denying plaintiff's second-step appeal. Id. at p. 2. LeBlanc's decision also demonstrates his belief that plaintiff was provided with due process in the full hearing and sentencing phases. Id. Thus, there was at least some evidence to find Young guilty of the rule violations. Additionally, Young testified that he received written descriptions of the charges against him and received a hearing before the disciplinary board when the charges were brought. He stated that the board received the incident reports and gave him the opportunity to provide his own testimony about the incident. These circumstances establish that there was no due process violation in plaintiff's disciplinary proceedings.

Second, Young received all appropriate due process of the type required by Wolff in connection with his loss of good time credits.

> "Where a prison disciplinary hearing may result in the loss of good time credits," due process requires: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in [the inmate's] defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."

Arceneaux v. Young, 369 F. App'x 620, 620 (5th Cir. 2010) (quoting Superintendent v. Hill, 472 U.S. 445, 454 (1985)).

Young testified that he received written descriptions of the charges against him and a hearing before the disciplinary board on those charges. He stated that the board received the incident reports and gave him the opportunity to provide his own testimony about the

incident. Under these circumstances, plaintiff received adequate due process in connection with the disciplinary charges against him, even to the extent that the proceedings resulted in loss of good time credits. Id. (citing Wolff, 418 U.S. at 564–66). Young therefore fails to state a due process claim for which he would be entitled to relief under Section 1983.

Third, in Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court held that a civil action for alleged civil rights violations that attacks the validity of state confinement, which has not been reversed, expunged, invalidated, or called into question by a federal court's issuance of a writ of habeas corpus, is not cognizable under Section 1983.

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

Id. at 486–87 (emphasis in original) (footnote omitted). Although the Supreme Court's decision in Heck concerned a civil action for monetary damages, the Fifth Circuit has also applied Heck in cases in which the plaintiff seeks injunctive relief, Clarke v. Stalder, 154 F.3d 186, 189 (5th Cir. 1998) (citing Edwards v. Balisok, 520 U.S. 641, 645–46 (1997)), and in cases alleging the loss of good time credit. Toppins v. Day, 73 F. App'x 84, 2003 WL 21757342, at *5 (5th Cir. 2003) (citing Edwards, 520 U.S. at 648).

Young's due process claim regarding the inability to earn good time credit is connected to the validity of the subject confinement to the extent he argues that his conviction of the disciplinary charges and the sanction of inability to earn good time impact his release date. Heck, 512 U.S. at 479; Teague v. Quarterman, 482 F.3d 769, 778–79 (5th Cir. 2007); Toppins, 2003 WL 21757342, at *5 (citing Edwards, 520 U.S. at 648); Clarke, 154 F.3d at 190. When a disciplinary action resulting in the loss of good time credit "has not been reversed or overturned," it "fails to meet Heck, [and is] . . . properly dismissed." Toppins, 2003 WL 21757342, at *5; accord Swafford v. Cain, 2014 WL 4418537, at *5 (M.D. La. Sept. 8, 2014) (citing Edwards, 520 U.S. at 648; Montoya v. Jones, 118 F. App'x 797, 798 (5th Cir. 2004); Johnson v. Boland, 2012 WL 2358157, at *1 (N.D. Tex. May 31, 2012)).

Young's complaint and testimony indicate that he was convicted of disciplinary charges for defiance and attempting to establish or establishing a relationship with a correctional officer. His penalty for conviction on these charges included affected his ability to earn good time credit. There is no indication in any of his written submissions or testimony that his convictions on the disciplinary charges were set aside in any of the ways described in Heck. Thus, any claims for relief that he asserts challenging his loss of good time credit are premature and must be dismissed under Heck. As the Fifth Circuit has noted, dismissal of plaintiff's Section 1983 claims is with prejudice to their being asserted again until the Heck conditions are met. Johnson v. McElveen, 101 F.3d 423, 424 (5th Cir. 1996)).

(B)    CONDITIONS OF CONFINEMENT

25

Plaintiff complains generally about various conditions of his confinement while in extended lockdown, including that he has suffered mentally, his phone use is limited, he cannot receive outside publications, attend church services or good time classes and has no access to similar privileges otherwise available to prisoners, including parole hearings and the ability to be released on parole. Plaintiff also complains that he has been subjected to cold food and bugs in the cells. He testified that the officers keep the fans and vents on constantly, do not turn the heat on when the temperature is cold and tamper with the inmates' mail. These claims must be dismissed either as legally frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims.

Plaintiff's testimony establishes that he was a convicted prisoner at all times that form the basis of his claims in this case. Regardless of whether an inmate is a pretrial detainee or a convicted prisoner, however, the standard of liability is the same for episodic acts or omissions of jail officials of the type alleged in this case. McCarty v. Zapata Cty., 243 F. App'x 792, 794 (5th Cir. 2007) (citing Gibbs v. Grimmette, 254 F.3d 545, 547 (5th Cir. 2001); Hare v. City of Corinth, 74 F.3d 633, 636 (5th Cir. 1996)); Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999). In Hare, the Fifth Circuit held

> (1) that the State owes the same duty under the Due Process Clause and the Eight Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

26

Hare, 74 F.3d at 650 (emphasis added).

Here, nothing in plaintiff's particular situation or in the circumstances concerning his conditions of confinement as described in his written submissions and Spears testimony leads to an inference that the conditions he described were the result of a prison official's act either "implement[ing] a rule or restriction or otherwise demonstrat[ing] the existence of an identifiable intended  condition or practice" or that the "official's act or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645.  Thus, the complained-of harm is a particular act or omission of one or more officials, and the deliberate indifference standard enunciated in Estelle, 429 U.S. at 104, applies.  Olabisiomotosho, 185 F.3d at 526; Tamez v. Manthey, 589 F.3d 764, 769-70 (5th Cir. 2009).  Applying this standard, Young's allegations do not constitute violations of the Constitution.   Two requirements must be met before Section 1983 liability will arise for constitutional violations relating to conditions of confinement of the type plaintiff described.

First, the alleged deprivation must objectively be "sufficiently serious," which means that "the inmate must show that he is incarcerated under conditions posing a substantial risk of harm."  Farmer, 511 U.S. at 847.  To rise to the level of a constitutional violation, the conditions must be "so serious as to deprive [plaintiff] of the minimal measure of life's necessities," in this case the basic human need for food and appropriate living temperatures. Alexander v. Tippah Cty., 351 F.3d 626, 630 (5th Cir. 2003) (quoting Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)).

Second, the inmate must show that a prison official was deliberately indifferent to inmate health or safety.  Farmer, 511 U.S. at 847.  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837 (emphasis added).  As noted above, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Southard, 114 F.3d at 551 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis added).  "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference."  Norton, 122 F.3d at 291 (citing Farmer, 511 U.S. at 838-40).

Young's written allegations and testimony meet neither of these two requirements. The conditions described by plaintiff do not rise to a level of seriousness constituting a constitutional violation.  Young alleges no serious harm or risk of serious harm in the constitutional sense, and the court can perceive none under the circumstances described in plaintiff's testimony and written submissions.

### (1)    COLD LOCKDOWN CELLS

Plaintiff claims that while in extended lockdown he has been exposed to ongoing cold conditions. He alleges that the officers keep the fans and vents on constantly and do not turn the heat on when the temperature is cold. As noted above, Young claims that he developed

a cold or fever from the cold temperatures and made sick calls on February 16 and 17, 2020, which eventually resulted in medical officials ordering medication for him. Record Doc. No. 45 at pp. 1–2. He claims that he was "coughing, sneezing, [and had a] running nose [and] sore throat." Id.

"Prisoners have a right to protection from extreme cold." Taylor v. Woods, 211 F. App'x 240, 241 (5th Cir. 2006) (quoting Palmer v. Johnson, 193 F.3d 346, 353 (5th Cir.1999) (internal quotation marks and citation omitted)(emphasis added)); accord Bienvenu v. Beauregard Parish Police Jury, 705 F.2d 1457, 1460 (5th Cir.1983) (per curiam). In Palmer, plaintiff was forced to remain outdoors in a field all night wearing a short-sleeved shirt and "was denied a jacket, blankets, or other means of keeping warm" resulting in his becoming "extremely cold as the temperature fell below fifty-nine degrees Fahrenheit." Palmer, 193 F.3d at 349. The Fifth Circuit has found that a prisoner's Eighth Amendment allegations were nonfrivolous when he alleged that "he was held in very cold conditions, for an extended period in November and December, wearing nothing but a paper gown during the daytime, and that he was ordered to remain on the cold concrete whenever he attempted to sleep on the warmer, metal bunk." Alex v. Stalder, 225 F. App'x 313, 314 (5th Cir. 2007).

However, in Ruiz v. LeBlanc, 643 F. App'x 358, 361 (5th Cir. 2016), the Fifth Circuit upheld the district court's finding that plaintiff's claims were frivolous when plaintiff conceded "that he was allowed to keep sets of clothings, [a] towel, two sheets, a blanket, and a mattress in his cell." Id. (internal quotation marks omitted). The court stated that "we have previously held that a prisoner cannot show an Eighth Amendment violation when a plaintiff

has access to blankets and similar clothing at much colder temperatures than those experienced by Ruiz." Id. (citing Bibbs v. Early, 541 F.3d 267, 275 (5th Cir.2008)). Even when a plaintiff alleges that he has inadequate bedding or clothing, however, the Fifth Circuit has found his claim to be frivolous if his allegations are too vague and conclusory. In Johnson v. Texas Bd. of Criminal Justice, 281 F. App'x 319, 320 (5th Cir. 2008), plaintiff alleged that he was subjected to ". . . low temperatures without adequate bedding or clothing . . . ." The court found that plaintiff's allegations "regarding cold [were] too vague and conclusory to state a claim of a 'sufficiently serious' deprivation that denied 'the minimal civilized measure of life's necessities.'" Id. at 321 (quoting Palmer, 193 F.3d at 352) (other citations omitted).

In this case, Young "has not alleged exposure to the type of extremely cold conditions that have been deemed a denial of the minimal measure of life's necessities." Ancar v. LeBlanc, 2019 WL 1783070, at *5 (M.D. La. Apr. 2, 2019), report and recommendation adopted, 2019 WL 1781418 (M.D. La. Apr. 23, 2019) (citing Palmer, 193 F.3d 346, 353 (5th Cir. 1999); Alex, 225 F. App'x at 314 (5th Cir. 2007)). Plaintiff has not alleged that he has been denied inadequate clothing or bedding. Unlike the situations described in the cases cited above, the allegedly cold temperature in lockdown, while no doubt uncomfortable, does not rise (or drop, temperature-wise, in this case) to the level of an Eighth Amendment violation. See Johnson, 281 F. App'x at 321; Ancar, 2019 WL 1783070, at *5.

Additionally, although plaintiff alleges that he developed a cold or fever due to these conditions, he also claims that prison medical officials ordered medication for him. Record

Doc. No. 45 at p. 2. To the extent that plaintiff alleges a medical care claim, in Estelle v. Gamble, 429 U.S. 97, 104 (1976), the Supreme Court has held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.

In the Section 1983 medical care context, a showing of deliberate indifference to serious medical needs "requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" Brewster v. Dretke, 587 F.3d 764, 770 (5th Cir. 2009), cert. denied, 130 S. Ct. 3368 (2010) (quoting Domino v. Tex, Dep't of Crim. Justice, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis added). "Mere negligence or a failure to act reasonably is not enough. The officer must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391 (1997). The deliberate indifference standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (additional citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291.

Initially, it cannot be concluded that plaintiff's cold or fever accompanied by sneezing, coughing, running nose and a sore throat presented a serious medical need for constitutional purposes. Certainly, plaintiff has not suffered "a life-long handicap or permanent loss" of the type many courts require to constitute a serious medical need for constitutional purposes. See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds by Hope v. Peltzer, 536 U.S. 730, 739 (2002) (citing Monmouth County v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (medical need is serious when it "results in an inmate's suffering 'a life-long handicap or permanent loss'")); see also Jackson v. Walton, 2003 WL 22846399, at *2 (N.D. Tex. Nov. 20, 2003), report and recommendation adopted, 2004 WL 1778943 (N.D. Tex. Aug. 6, 2004) ("Nothing about plaintiff's initial complaint of fever and a sore throat would indicate a medical emergency or even a serious medical need and it is commonly recognized that doctors can do little about a cold virus."); Griffin v. DeRobertis, 557 F. Supp. 302, 306 (N.D. Ill. 1983) (aches and sore throat not serious). Young's written submissions do not indicate that the slight delay in treatment about which he complains had any actual deleterious effect on his physical condition.

Even assuming, however, without concluding that plaintiff's condition presented a serious medical need for constitutional purposes, Young has alleged facts in his written submissions that negate any inference of deliberate indifference by jail officials. His written submissions show that he has received constitutionally adequate medical care for this condition. He was seen by a nurse and emergency medical technician, the latter of which

ordered medication for him. Under these circumstances, it cannot be inferred that jail personnel were deliberately indifferent in any way to plaintiff's medical condition. While it is clear from his written submissions that Young is not satisfied with the speed or nature of his medical care, and that he experienced some delay in the officials' ordering the medication, no finding of deliberate indifference can be made based on this record.

> [T]he decision whether to provide additional treatment is a classic example of a matter for <u>medical judgment</u>. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, <u>intentionally</u> treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added). No such showing has been made on the current record. In Young's case, the decisions made by the treating medical providers to render the care that they gave are classic examples of the exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

Although Young has alleged that he was forced to make a second sick call because the nurse failed to order his medication when addressing the first sick call, mere delay in receiving care is not in and of itself a constitutional violation. <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990). Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs. <u>Wilson</u>, 501 U.S. at

298. No such showing can be made in this case in light of the medication the medical officials ordered for his condition.

Contentions like Young's that amount to a disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Morgan v. Texas Dep't of Criminal Justice McConnell Unit, 537 F. App'x 502, 507 (5th Cir. 2013) (quoting Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition that ultimately resulted in death does not constitute deliberate indifference, even if treatment was negligently administered)); accord Rowe v. Norris, 198 Fed. Appx. 579, 2006 WL 2711945, at *2 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Walton v. Sec'y Veterans Admin., 187 F. Supp. 3d 1317, 1329 (N.D. Ala. 2016) (quoting Bass v. Sullivan, 550 F.2d 229, 232 (5th Cir. 1977) ("[A] 'malpractice [claim] will not lie under [Section] 1983' because it is a claim arising under state common law – not a constitutional violation."); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Williams v. Browning, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his

34

medications timely, but did not establish any substantial harm from the delay, failed to state a claim for deliberate indifference).

Plaintiff's complaints in this case about his medical care fail to state a claim of violation of his constitutional rights sufficient to obtain relief under Section 1983 because he cannot establish "deliberate indifference" under the applicable constitutional standard. To whatever extent he alleges a medical care claim, it must therefore be dismissed.

Accordingly, plaintiff's claim against defendants based on the allegedly cold temperatures in the lockdown cells must be dismissed as legally frivolous or for failure to state a claim upon which relief can be granted.

(2)    COLD FOOD

As to his complaints about cold food, constitutional standards require only that prison authorities provide an inmate with "sufficient nutritional value to preserve health." Pitt v. Weaver, 2015 WL 2452348, at *4 (E.D. La. May 21, 2015) (quoting Eason v. Thaler, 73 F.3d 1322, 1327 (5th Cir.1996); Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir.1977)); Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999); Green v. Farrell, 801 F.2d 765, 770 (5th Cir. 1986) (quoting Sullivan, 553 F.2d at 380).

The Constitution does not require that convicted inmates be provided with food at particular temperatures or every culinary amenity which one may find desirable. Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd. on other grounds sub nom., Bell v. Wolfish, 441 U.S. 520 (1979) (citing Newman, 559 F.2d at 291); Murray v. Matty, 1985 WL 4948 at *1 (E.D. Pa. 1985); see McGarrah v. Kimbrow, 2015 WL 105228, at *5 (N.D. Tex. Jan. 6,

2015) (". . . [t]he fact that food was served cold or at improper temperatures does not rise to a constitutional deprivation.") (citing Hamm v. DeKalb CTY., 774 F.2d 1567, 1575 (11th Cir. 1985), cert. denied, 475 U.S. 1096 (1986) ("The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation.")); Hunt v. Carver, 2019 WL 7486810, at *5 (S.D.W. Va. Nov. 7, 2019) ("[t]o the extent Plaintiff complains of being served cold food, such is insufficient to state a constitutional claim."), report and recommendation adopted in part, 2020 WL 61175 (S.D.W. Va. Jan. 6, 2020), and report and recommendation adopted, 2020 WL 1465905 (S.D.W. Va. Mar. 20, 2020); McCoy v. Good, 255 F.Supp.2d 233, 260 (S.D.N.Y. 2003) (denial of warm food is not, by itself, a deprivation of the minimal civilized measure of nutrition so as to support prisoner's Eight Amendment claim challenging conditions of confinement); Abdul-Akbar v. Dep't of Corrs., 910 F.Supp. 986, 1006 (D. Del. 1995), judgment aff'd 111 F.3d 125 (3d Cir. 1997) (prison officials did not violate the Eight Amendment where an inmate alleged that officials served cold meals on unsanitary carts because inmate failed to demonstrate that he was denied an "identifiable human need"). Accordingly, plaintiff's claims of cold food must be dismissed.

      (3)    MAIL TAMPERING AND NO ACCESS TO PUBLICATIONS

Young complains generally that defendants tampered with his mail and denied him access to non-legal publications. To whatever extent, if any, he alleges that defendants tampered with his legal mail, the United States Supreme Court and Fifth Circuit Court of Appeals have held that prison practices or restrictions concerning prisoner mail implicate two

distinct but intertwined constitutional rights: (1) the right of access to the courts, which the Supreme Court has indicated lies in both the Due Process Clause and the First Amendment, Wolff v. McDonnell, 418 U.S. 539, 575–76 (1974); and (2) the right to freedom of speech guaranteed by the First Amendment. Walker v. Navarro Cnty. Jail, 4 F.3d 410, 413 (5th Cir. 1993); Brewer v. Wilkinson, 3 F.3d 816, 820 (5th Cir. 1993). Specifically, the right of access to the courts is implicated only when the mail in question is legal in nature, while the right to free speech is relevant to claims involving both legal and non-legal mail. See generally Brewer, 3 F.3d 816.

Regardless what rights are implicated, however, it is clear that prisoners' constitutional rights with respect to mail are not absolute. A prison practice or regulation may permissibly interfere with an inmate's mail, including his legal mail, if the practice is "reasonably related to a legitimate penological interest." Morgan v. Quarterman, 570 F.3d 663, 666 (5th Cir. 2009) (quotation omitted) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); see Jackson v. Cain, 864 F.2d 1235, 1248 (5th Cir. 1989) (reasonableness standard applies to challenges to regulations as well as to actions of a prison official).

To the extent Young is complaining that defendants' alleged tampering with his legal mail interfered with his constitutional right of access to the courts, it is well established that prisoners have such a constitutional right. Bounds v. Smith, 430 U.S. 817, 821 (1977). Under the First Amendment, prisoners have the right to a "reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." Lewis v. Casey, 518 U.S. 343, 356 (1996) (emphasis added). Although "the precise contours of a

prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has <u>not</u> extended this right to encompass more than <u>the ability of an inmate to prepare and transmit a necessary legal document to a court</u>." <u>Vaccaro v. United States</u>, 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); <u>accord</u> <u>Manning v. Sumlin</u>, 540 F. App'x 462, 463 (5th Cir. 2013) (citing <u>Lewis</u>, 518 U.S. at 356; <u>Brewer</u>, 3 F.3d at 821).

Thus, an inmate's right of access to the courts may be violated when a prison official tampers or interferes with his legal mail. <u>Brewer</u>, 3 F.3d at 820. However, to state a claim that his constitutional right of access to the courts was violated by defendants, Young must demonstrate that <u>his position as a litigant was actually prejudiced</u>. <u>Lewis</u>, 518 U.S. at 348; <u>Every v. Jindal</u>, 413 F. App'x 725, 727 (5th Cir. 2011) (citing <u>Lewis</u>, 518 U.S. at 349–50; <u>Jones v. Greninger</u>, 188 F.3d 322, 325 (5th Cir. 1999)); <u>Cochran v. Baldwin</u>, 2006 WL 2418945, at *1 (5th Cir. Aug. 18, 2006); <u>Eason v. Thaler</u>, 73 F.3d 1322, 1328 (5th Cir. 1996). Specifically, Young must show that defendants' alleged tampering with his legal mail "hindered his efforts to pursue a legal claim." <u>Lewis</u>, 518 U.S. at 351.

In this case, Young's written submissions, even as expanded upon by his <u>Spears</u> testimony, fail entirely to state a cognizable Section 1983 claim for violation of his right of access to the courts. Under the Fifth Circuit's interpretation of Supreme Court precedent, Young's right of access to the courts extends only to his ability as an inmate to prepare and transmit necessary legal documents to a court. <u>Brewer</u>, 3 F.3d at 821. The record clearly reflects that voluminous mail regarding the instant lawsuit has been successfully transmitted

and received. Neither plaintiff's written submissions nor his <u>Spears</u> testimony show that his ability to prepare and submit legal mail was impeded in any way by defendants.

Additionally, Young fails to show that defendants' alleged tampering with his legal mail prejudiced his position as a litigant, as required by <u>Lewis</u> and its progeny. In the instant case, I am recommending that plaintiff's claims should be dismissed <u>not</u> for failure to receive legal paper work or for his failure to provide information, but instead on substantive grounds after full review and finding that his claims are legally frivolous and otherwise fail to state a claim for which relief can be granted. Accordingly, to the extent Young claims that defendants' tampering with his legal mail interfered with his access to the courts, his claim is legally frivolous and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

As to Young's free speech rights, "'[a] prison official's interference with a prisoner's legal mail . . . may violate the prisoner's First Amendment right to free speech–i.e., the right to be free from unjustified governmental interference with communication.'" <u>Damm v. Cooper</u>, 288 F. App'x 130, 132 (5th Cir. 2008) (quoting <u>Brewer</u>, 3 F.3d at 820). However, the Fifth Circuit has recognized a legitimate penological need for prison "personnel to open, review, and occasionally censor outgoing mail" because of concerns about possible threats to prison security, including ensuring that the mail does not contain contraband. <u>Franco v. Collins</u>, 2015 WL 136544, at *1 (S.D. Tex. Jan. 8, 2015) (citing <u>Busby</u>, 359 F.3d at 721); <u>McCartney v. Keith</u>, WL 5092017, at *2 (W.D. La. Oct. 9, 2014) (citing <u>Busby</u>, 359 F.3d at 721). As stated above, the record reflects no interference whatsoever by defendants with the

submission of Young's legal mail to this court. Young has successfully communicated with the court by submitting numerous legal documents via mail from his prison address, which were received by this court without issue. Accordingly, to the extent Young claims that defendants' tampering with his legal mail interfered with his free speech rights, his claim is legally frivolous and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

For the foregoing reasons, to whatever extent plaintiff alleges that defendants tampered with his legal mail, this claim is legally frivolous in all respects and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

As to Young's allegations that he was denied access to non-legal publications while in lockdown, First Amendment liberties are implicated in the censorship of non-legal prisoner mail. Brewer, 3 F.3d at 821–22. When a prison practice involving prisoner mail–including non-legal mail–impinges on an inmate's constitutional rights, such a practice is valid if it is "reasonably related to legitimate penological interests." Id. at 825.

In this case, Young was in extended lockdown for disciplinary violations during the time period about which he complains. In Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1983), the Fifth Circuit held that restrictions on a prisoner's personal mail while the prisoner was in administrative lockdown did not violate the Constitution. Because the prisoner was in isolation as punishment for his conduct, the court held:

40

Left free to write to anyone in the world and to receive literature of any kind, prisoner might find punitive isolation desirable, offering solitude and leisure as an alternative to the ordinary conditions of prison work and life. Thus, a narrower restriction on first amendment interests would likely prove ineffective in maintaining discipline.

Id.; accord Gregory v. Auger, 768 F.2d 287, 290 (8th Cir. 1985) (restrictions on incoming mail to prisoners in disciplinary detention legitimately related to attempts to make detention less attractive and deter future infractions of prison rules); Hodge v. B.B. Sixty Rayburn Corr. Ctr., 2008 WL 4628586, at *6 (E.D. La. Oct. 16, 2008) (finding a prison's restrictions on an inmate's access to publications while on disciplinary lockdown constitutional).

The alleged denial of Young's access to publications was obviously implemented as part of his placement in disciplinary lockdown, which is a legitimate penological concern. As in Hodge and Gregory, the restrictions on Young's access to periodicals in lockdown were legitimately related to attempts to make disciplinary lockdown less attractive and to deter future infractions of prison rules. In addition, Young has made no allegations that these restrictions prejudiced any pending litigation, including the instant case. Because the alleged reading material restrictions served a legitimate government concern and plaintiff made no allegations of legal prejudice, his First Amendment rights were not violated, and his complaint about his restricted access to reading materials in extended lockdown fails to state a constitutional violation under Section 1983.

(4)    NO CHURCH SERVICES WHILE IN LOCKDOWN

Young alleges that he has been restricted from attending church while in lockdown. "The Constitution requires that 'reasonable opportunities must be afforded to all prisoners

to exercise . . . religious freedom.'" <u>Green v. McKaskle</u>, 788 F.2d 1116, 1126 (5th Cir. 1986) (quoting <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972)). "The Supreme Court has also determined that the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1, protects the rights of prisoners who are unable to freely attend to their religious observances and who are dependant on the government's permission and accommodation to do so." <u>McAllister v. Strain</u>, 2009 WL 500560, at *4 (E.D. La. Feb. 25, 2009) (citing <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 721 (2005)).

While inmates retain some protections afforded by the First Amendment and RLUIPA, the rights of all prisoners are restricted. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (citations omitted). The propriety of limiting prisoners' First Amendment rights "arise[s] both from the fact of incarceration <u>and from valid penological objectives--including deterrence of crime</u>, rehabilitation of prisoners, <u>and institutional security</u>." <u>Id.</u> (emphasis added).

Evaluation of these valid penological objectives is committed to the judgment of prison administrators, and courts must afford deference to their evaluation. <u>Id.</u> at 349; <u>Cutter</u>, 544 U.S. at 717 (addressing the deference given prison officials when applying the RLUIPA). Thus, when the action of prison officials impinges on prisoners' constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests." <u>Id.</u>

In this case, Young "has not identified any restriction imposed, or an action by a prison official, which would constitute a substantial burden on his free exercise of his religion." McAllister, 2009 WL 500560, at *4 (E.D. La. Feb. 25, 2009) (citing Baranowski v. Hart, 486 F.3d 112, 124 (5th Cir.2007) (burden under the RLUIPA is on plaintiff to establish that a governmental action substantially burdened the exercise of his religion)). The prison officials' prohibitions of plaintiff's attendance at religious meetings while he is housed in disciplinary lockdown creates no constitutional violation for two reasons. First, these prohibitions serve the legitimate penological interests of maintaining institutional security and deterring conduct, either by Young or by others against Young, that poses a threat to security. These concerns are reasonably related to legitimate penological interests.

Second, the restrictions do not constitute a substantial burden on Young's free exercise of his religion to such an extent that his limited First Amendment rights as a prisoner might be violated. He has not alleged that he is restricted from other methods of exercising his religion, including through prayer. See Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998) ("relatively short-term and sporadic" interference with inmate's ability to pray not substantial burden on religious exercise); Clifton v. Lappin, 2010 WL 4136150, at *6 (W.D. La. Oct. 4, 2010), report and recommendation adopted, 2010 WL 4168271 (W.D. La. Oct. 18, 2010) ("Although [p]laintiff may not have been able to attend formal services during the lock down, he was certainly able to pray in his cell.") (citing Hamilton v. Schriro, 74 F.3d 1545, 1551 (8th Cir. 1996) (no constitutional violation when inmate has alternative means, including prayer, for practicing religion)); Doty v. Williams, 995 F. Supp. 1081, 1083 (D.

Ariz. 1998) (same) (citing O'Lone, 482 U.S. at 352); McAllister, 2009 WL 500560, at *5 (same).

Young fails to state a claim upon which relief might be granted because no constitutional violation has occurred in this context.

(5)    BUGS

As to plaintiff's vague allegations that there were bugs in his cell, "[t]he presence of pests, by itself, is not a constitutional violation." Walker v. Davis, 2019 WL 2465298, at *13 (E.D. Tex. Jan. 10, 2019), report and recommendation adopted sub nom., Walker v. Collier, 2019 WL 1421152 (E.D. Tex. Mar. 28, 2019) (citing Morrison v. Bench, 2009 WL 4858066 (N.D. Tex., December 14, 2009) (claim was frivolous where prisoner was placed in solitary confinement and required to relocate to cells at the end of the building which were infested with bugs and mosquitos); Bush v. Monroe, 2018 WL 4042418 (E.D. Tex., August 24, 2018) (living in a leaky cell with insects, broken doors, and rust may be undesirable and uncomfortable but is not itself a constitutional violation) (other citations omitted). See also Waller La v. Ward, 2016 WL 7235832, at *3 (W.D. La. Oct. 19, 2016), report and recommendation adopted sub nom. La v. Ward, 2016 WL 7240152 (W.D. La. Dec. 14, 2016) (citing Simmons v. Gusman, 2015 WL 151113, at *4 (E.D. La., Jan. 12, 2015); Clark v. Gusman, 2012 WL 1825306, at *5 (E.D. La. Mar. 29, 2012), report and recommendation adopted, 2012 WL 1825302 (E.D. La. May 18, 2012); Murray v. Edwards County Sheriff's Department, 453 F.Supp.2d 1280, 1292 (D. Kan. 2006), aff'd, 248 Fed. App'x 993 (10th Cir.

2007); <u>Smith v. Barber</u>, 316 F.Supp.2d 992, 1028–29 (D. Kan. 2004)). Thus, Young's allegations regarding bugs in his cell must be dismissed.

(6)    <u>TELEPHONE RESTRICTIONS IN LOCKDOWN</u>

Young alleges that his telephone access has been restricted while in lockdown, resulting in him losing contact with his family and friends. In general, Young has no constitutional right to telephone privileges while in lockdown. Prison officials have broad discretion to administer conditions of confinement, and the federal courts will not interfere with legitimate prison administration in the absence of a constitutional violation. <u>Bell</u>, 441 U.S. at 547–48 (1979); <u>Alexander v. Neustrom</u>, 2016 WL 4626604, at *5 (W.D. La. Sept. 6, 2016) (citing <u>Smith v. Bingham</u>, 914 F.2d 740, 742 (5th Cir. 1990)).

Prisoners have "'no right to unlimited telephone use.' Instead, a prisoner's right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution.'" <u>Harvey v. Johnson</u>, 2017 WL 7051214, at *3 (W.D. La. Dec. 11, 2017), <u>report and recommendation adopted</u>, 2018 WL 540338 (W.D. La. Jan. 24, 2018) (quoting <u>Washington v. Reno</u>, 35 F.3d 1093, 1100 (6th Cir. 1994) (other citations omitted). "Prisons legitimately impose a variety of restrictions on inmates' use of telephones." <u>Roy v. Stanley</u>, 2005 WL 2290276, at *7 (D.N.H. Sept. 20, 2005) (citing <u>United States v. Lewis</u>, 406 F.3d 11, 13 (1st Cir. 2005); <u>Gilday v. Dubois</u>, 124 F.3d 277, 293 (1st Cir. 1997); <u>Spurlock v. Simmons</u>, 88 F. Supp. 2d 1189, 1193 (D. Kan. 2000)).

In addition, "[a] prisoner does not retain constitutional rights that are inconsistent with the legitimate penological objectives of the correction system." <u>Bingham</u>, 914 F.2d 740, 742

(5th Cir. 1990); <u>accord</u> <u>Perry v. Allemand</u>, 2015 WL 10579870, at *2 (W.D. La. Sept. 30, 2015), <u>report and recommendation adopted</u>, 2016 WL 1354944 (W.D. La. Mar. 31, 2016) (citing <u>Bingham</u>, 914 F.2d at 742). In this case, Young has not asserted any facts tending to show that the restrictions on his telephone privileges reflecting disciplinary action are unrelated to legitimate penological interests.

Additionally, plaintiff's First Amendment rights were not infringed by this deprivation of telephone privileges. As noted above, prisoners have "no right to unlimited telephone use." <u>Harvey</u>, 2017 WL 7051214, at *3, <u>report and recommendation adopted</u>, 2018 WL 540338 (W.D. La. Jan. 24, 2018) (quoting <u>Washington</u>, 35 F.3d at 1100 (6th Cir. 1994) (other citations omitted). Prison regulations concerning telephone use do not violate an inmate's First Amendment rights so long as the inmate does not suffer from an inability to communicate with the courts, counsel, family and friends. <u>Hill v. Estelle</u>, 537 F.2d 214, 215 (5th Cir. 1976).

Though plaintiff claims that he has been unable to communicate with his family and friends, he also states that, even on extended lockdown, prisoners are allowed to use the phone once a week, and he was only deprived of that privilege while on cell confinement due to his request to be placed on suicide watch. Additionally, the record, including plaintiff's <u>Spears</u> testimony, demonstrates that he has been able to communicate with the court regarding the instant case. The telephone was made available to Young during his phone call with the court and he has also been able to communicate with the court using the mail, as

46

explained above. Even accepting plaintiff's allegations as true, his claim is legally frivolous in that prison officials did not place unreasonable limitations on his telephone use.

(7)    NO ACCESS TO GOOD TIME CLASSES

Plaintiff claims that while in lockdown he has been unable to attend good time classes. However, inmates have no protected liberty interest in specific educational, rehabilitative or self-improvement programs. Price v. Johnson, 2020 WL 1312400, at *7 (W.D. La. Feb. 26, 2020), report and recommendation adopted, 2020 WL 1310570 (W.D. La. Mar. 18, 2020) (citing McBride v. Powers, 364 F. App'x 867, 870–71 (5th Cir. 2010); Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988)) (other citations omitted);see Lato v. Attorney Gen., 773 F. Supp. 973, 978 (W.D. Tex. 1991). Prisoners have no constitutional right to participate in educational, work release, rehabilitation or other self-improvement programs. Joseph v. U.S. Fed. Bureau of Prisons, 232 F.3d 901, 2000 WL 1532783, at *1–2 (10th Cir. Oct. 16, 2000); Wishon v. Gammon, 978 F.2d 446, 450 (8th Cir. 1992); Beck, 842 F.2d at 762; Oladipupo v. Austin, 104 F. Supp. 2d 626, 638 (W.D. La. 2000). Thus, this claim must be dismissed.

(8)    NO PAROLE HEARINGS WHILE IN LOCKDOWN

Young claims that he is unable to attend parole hearings and thus cannot be considered for parole release during his time in extended lockdown. In general, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Wetzel v. Warden, David Wade Corr. Ctr., 2015 WL 4092899, at *2 (W.D. La. July 6, 2015) (citing Greenholtz v. Inmates of the Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979)). While "state-created interests which 'inevitably

47

affect the duration of [a prisoner's] sentence' may qualify for constitutional protection under the Due Process Clause," Wetzel, 2015 WL 4092899, at *2 (citing Sandin, 515 U.S. at 487; Orellana v. Kyle, 65 F.3d 29, 31–32 (5th Cir.1995)), Louisiana law creates no constitutionally protected liberty interest in parole release. Id. (citing Stevenson v. Louisiana Bd. Of Parole, 265 F.3d 1060 (5th Cir.2001); Sinclair v. Ward, 205 F.3d 1338 (5th Cir.1999) (Louisiana parole statutes do not give rise to a constitutionally protected liberty interest in parole release.)). "Further, such 'speculative, collateral consequences' of prison decisions that may affect the timing of parole 'do not create constitutionally protected liberty interests.'" Id. (citing Luken v. Scott, 71 F.3d 192 at 193 (5th Cir.1995) (stating that speculative, collateral consequences of prison administrative decisions such as the loss of the opportunity to earn good-time credits, which might lead to earlier parole, do not create constitutionally protected liberty interests).

Although there is no constitutionally protected liberty interest in parole release, the Louisiana Supreme Court has held that such a right exists as to consideration of parole release after an inmate is eligible for parole. Thomas v. LeBlanc, 2019 WL 5653200, at *7 (M.D. La. Oct. 31, 2019) (citing Bosworth v. Whitley, 627 So. 2d 629 (La. 1993)).

The Louisiana Supreme Court stated:

[I]t is apparent that the Louisiana parole statutes do not create an expectancy of release or liberty interest in general, or for those with life terms in particular. Inmates meeting standards contained in the law do have a statutory right to parole consideration, but the Parole Board has full discretion when passing on applications for early release.

48

Id. at *7 (emphasis added); see also Damone v. Whitley, 694 So. 2d 1205, 1207 (La. App. 1st Cir. 1997). "However, 'the right to be considered for parole is a substantial one, it is not bestowed on a prisoner until statutory requirements are met.'" Id. (quoting Damone, 694 So. 2d at 1207) (other citations omitted).

The record is unclear if Young was eligible for parole consideration at the time he was convicted of the allegedly false disciplinary charges and during his time in extended lockdown. The version of La. Rev. Stat. § 15:574.4, effective when Young was convicted,[2] provides various time lines for when a convicted prisoner is eligible for parole consideration, depending on the type of crime of which they were convicted and of how many felonies they had been convicted, if any, before they were incarcerated for the present offense. La. Rev. Stat. § 15:574.4 (effective August 1, 2013 to July 31, 2014, available on Westlaw).The record is unclear regarding Young's previous criminal record and other salient facts necessary to determine his eligibility for parole consideration.

Even if plaintiff is eligible for parole consideration, in Louisiana, a committee on parole follows certain guidelines in determining whether to grant parole. La. Rev. Stat. § 15:574.2. Young states in his written submissions that he is eligible for parole if he is "write-up free" for 12 months, Record Doc. No. 38 at p. 7, under 2017 La. Acts No. 280, § 3, which amended La. Rev. Stat. § 15:574.2(C).  That statute provides for certain offenders to be

---

[2] There is a discrepancy in the record concerning when Young was convicted of distribution of crack cocaine. His complaint states that he was convicted on November 13, 2019, Record Doc. No. 1 at p. 3, but in his statement of facts, Record Doc. No. 6 at p.1, and during his oral testimony he stated that he was convicted on November 13, 2013. For purposes of this analysis, I will assume that he made a typographical error in his complaint.

released on parole based on their satisfying a number of conditions. The statute provides in

pertinent part that:

> C. (1) The committee shall meet in a minimum of three-member panels at the
> adult correctional institutions on regular scheduled dates, not less than every
> three months. Such dates are to be determined by the chairman. Except as
> provided for in Paragraph (2) of this Subsection or in cases where the offender
> is released pursuant to Paragraph (4) of this Subsection,[3] three votes of a
> three-member panel shall be required to grant parole, or, if the number exceeds
> a three-member panel, a unanimous vote of those present shall be required to
> grant parole.
>
> (2) Except in cases where the offender is released pursuant to Paragraph (4) of
> this Subsection, the committee may grant parole with two votes of a
> three-member panel, or, if the number exceeds a three-member panel, a
> majority vote of those present if all of the following conditions are met:
>
> (a) The offender has not been convicted of a sex offense as defined in R.S.
> 15:541 or an offense which would constitute a sex offense as defined in R.S.
> 15:541, regardless of the date of conviction.
>
> (b) <u>The offender has not committed any major disciplinary offenses in the
> twelve consecutive months prior to the parole eligibility date</u>. A major
> disciplinary offense is an offense identified as a Schedule B offense by the
> Department of Public Safety and Corrections in the Disciplinary Rules and
> Procedures of Adult Offenders.
>
> (c) The offender has completed the mandatory minimum of one hundred hours
> of pre-release programming in accordance with R.S. 15:827.1 if such
> programming is available at the facility where the offender is incarcerated.

---

[3] 2017 La. Acts No. 280, § 3 also created La. Rev. Stat. § 15:574.2(C)(4), which provided that offenders who committed an offense on or after November 1, 2017, unless their release was prohibited by statute and provided they were otherwise eligible for parole, would be released on administrative parole on the date they were eligible for parole <u>without</u> a hearing before the committee if the offender satisfied a number of conditions, one of which was that "[t]he offender has not committed any major disciplinary offenses in the twelve consecutive months prior to the administrative parole eligibility date." However, as noted above, plaintiff was convicted on November 13, 2013, making this provision inapplicable to him. Additionally, La. Rev. Stat. § 15:574.2(C)(4) was recently repealed by 2019 La. Acts No. 369.

(d) The offender has completed substance abuse treatment as applicable.

(e) The offender has obtained a GED credential, unless the offender has previously obtained a high school diploma or is deemed by a certified educator as being incapable of obtaining a GED credential due to a learning disability. If the offender is deemed incapable of obtaining a GED credential, the offender must complete at least one of the following: a literacy program, an adult basic education program, or a job skills training program.

(f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Department of Public Safety and Corrections.

La. Rev. Stat. § 15:574.2(C)(1)-(2)(a-f)) (emphasis added). As noted above, it is unclear from the record when, if ever, plaintiff reached his parole eligibility date. Even assuming, without deciding, that plaintiff was eligible for parole consideration and thus has a constitutionally protected liberty interest, the United States Supreme Court has held that deprivation from parole consideration "standing alone might not be sufficient to create a liberty interest." Wilkinson v. Austin, 545 U.S. 209, 224 (2005); accord Wilkerson v. Goodwin, 774 F.3d 845, 854 (5th Cir. 2014). The Court in Wilkinson found a Fourteenth Amendment violation based on a complete bar to parole consideration coupled with conditions that met the criteria for an atypical and significant hardship on an inmate in relation to ordinary incidents of prison life. 545 U.S. at 223. As noted above, the conditions described by Young do not pose an atypical and significant hardship on him such that would constitute a constitutional violation. Accordingly, this claim must also be dismissed.

(9)    NO PHYSICAL INJURIES

Young alleges that he has suffered mentally as a result of his conditions of confinement. However, he alleges no more than de minimis physical injuries as a result of any of these conditions. "Under § 1997e(e), '[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' The 'physical injury' required by § 1997e(e) 'must be more than de minimus [sic], but need not be significant.'" Alexander v. Tippah Cty., Miss., 351 F.3d 626, 631 (5th Cir. 2003) (quoting Harper v. Showers, 174 F.3d 716, 719 (5th Cir.1999) (quoting Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir.1997)) (alteration in original).

The only physical injuries about which plaintiff complains – a cold and/or fever, including coughing, sneezing, and a running nose and sore throat, as a result of these conditions – are de minimis. See Hill v. Smith, 2010 WL 148272, at *6 (W.D. La. Jan. 12, 2010) (finding cold and sinus problems as a result of cold conditions in jail de minimis injuries for purposes of recovery for conditions of confinement claims); see also Jackson, 2003 WL 22846399, at *2 ("Nothing about plaintiff's initial complaint of fever and a sore throat would indicate a medical emergency or even a serious medical need and it is commonly recognized that doctors can do little about a cold virus."); Griffin, 557 F. Supp. at 306(aches and sore throat not serious). Thus, he has no right as a matter of law to recover the compensatory damages he seeks. 42 U.S.C. § 1997e(e); Hutchins v. McDaniels, 512 F.3d 193, 196 (5th Cir. 2007); Geiger v. Jowers, 404 F.3d 371, 374-75 (5th Cir. 2005); Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001).

(C)    RETALIATION CLAIM

As to retaliation, it is correct that prison officials may not retaliate against a prisoner for exercising his First Amendment right of access to the courts or to complain through proper channels about alleged misconduct by prison officials. Walker v. Savers, 2016 WL 4151212, at *5 (5th Cir. Aug. 4, 2016) (citing Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006)); Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995). However, the law in the Fifth Circuit is based on the following general principles:

> The elements of a retaliation claim are the invocation of a specific constitutional right, the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, i.e., but for the retaliatory motive the complained of incident . . . would not have occurred. With respect to the last element, we [have] emphasized that an action motivated by retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, may have been legitimate.

Clarke v. Stalder, 121 F.3d 222, 231 (5th Cir. 1997), vacated in part & reinstated in relevant part, 154 F.3d 186 (5th Cir. 1998) (citing Bounds v. Smith, 430 U.S. 817 (1977); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Woods, 60 F.3d at 1164-66) (quotations and additional citations omitted); accord Walker, 2016 WL 4151212, at *5.

In Woods, the Fifth Circuit, applying the general First Amendment principles addressed above, affirmed the district court's denial of defendants' motion for summary judgment. Defendants had sought dismissal of a prisoner's claim based on allegedly false disciplinary charges by defendants in alleged retaliation for plaintiff's letters of complaint to a federal judge and the prison warden. The Fifth Circuit agreed with the district court that

the inmate's retaliation claim should be permitted to proceed, but in doing so it expressed the following caution: "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." Woods, 60 F.3d at 1166 (citation and quotation omitted). The Fifth Circuit warned that "trial courts must carefully scrutinize these claims." Id.

> To state a claim of retaliation an inmate must allege the violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive the complained of incident . . . would not have occurred. This places a significant burden on the inmate . . . . The inmate must produce direct evidence of motivation or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred."

Id. (citations omitted) (emphasis added); accord Walker, 2016 WL 4151212, at *5.

A year after Woods was decided, the Supreme Court reexamined the scope of prisoners' First Amendment right of access to the courts in Lewis v. Casey, 518 U.S. 343 (1996). Significantly, to state a claim that his constitutional right of access to the courts was violated, a prisoner must demonstrate that his position as a litigant was actually prejudiced. Id. at 356; Every v. Jindal, 413 F. App'x 725, 727 (5th Cir. 2011) (citing Lewis, 518 U.S. at 349–50; Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999)); Cochran v. Baldwin, 196 F. App'x 256, 257–58 (5th Cir. 2006) (citing Lewis, 518 U.S. at 350–51); Eason v. Thaler, 73 F.3d 1322, 1328 (5th Cir. 1996). In Lewis, the Supreme Court made clear that an inmate

must establish actual injury to state a claim for denial of his right of access to the courts. 518

U.S. at 349–50.

In Morris, a case of first impression in the Fifth Circuit, the court addressed

"[w]hether an allegation of de minimis retaliatory acts can support a retaliation claim" under

the First Amendment. Morris, 449 F.3d at 684. The court stated that

> [t]he question, however, is not whether the violation of [plaintiff's] constitutional rights was de minimis, but whether any violation occurred at all. To establish a constitutional violation, an inmate must show that he suffered a qualifying adverse retaliatory act. If the retaliation alleged by [plaintiff] does not pass this bar, he has suffered no constitutional injury.

Id. The Fifth Circuit held that

> [t]he purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights. Some acts, though maybe motivated by retaliatory intent, are so de minimis that they would not deter the ordinary person from further exercise of his rights. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.
> . . . . Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights. . . .
> With this standard in mind, we turn to the specific retaliation alleged by [plaintiff] to determine whether the actions of the [prison] officials would have deterred a person of ordinary firmness from exercising his First Amendment right to file grievances against prison officials.

Id. at 686 (citing Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)).

The Fifth Circuit's reasoning and rulings in Morris accord with the Supreme Court's

holding in Lewis that a prisoner who brings a retaliation claim under the First Amendment

must allege actual injury in order to assert a claim. Furthermore, the alleged retaliatory acts

must be more than <u>de minimis</u>, which means they must be capable of deterring a person of ordinary firmness from further exercising his constitutional rights.

> Thus, the law in the Fifth Circuit
>
> is well established that prison officials may not retaliate against an inmate who exercises his right of access to court. Officials likewise may not retaliate against an inmate for using the grievance system. A plaintiff must allege facts showing that the defendant possessed a retaliatory motive. The inmate must show <u>more than his personal belief that he was the victim of retaliation. Mere conclusory allegations of retaliation are not enough</u>.

<u>Decker v. McDonald</u>, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010), <u>report & recommendation adopted</u>, 2010 WL 1424292 (E.D. Tex. Apr. 7, 2010) (citing <u>Morris</u>, 449 F.3d at 687; <u>Jones v. Greninger</u>, 188 F.3d 322, 324–25 (5th Cir. 1999); <u>Johnson v. Rodriguez</u>, 110 F.3d 299, 310 (5th Cir. 1997); <u>Moody v. Baker</u>, 857 F.2d 256, 258 (5th Cir. 1988); <u>Whittington v. Lynaugh</u>, 842 F.2d 818, 820 (5th Cir. 1988)) (additional citations omitted) (emphasis added); <u>accord Walker</u>, 2016 WL 4151212, at *5.

Accepting as true plaintiff's testimony and written allegations, he has not established that a violation of his federal constitutional rights concerning retaliation has occurred under the circumstances he described. The Fifth Circuit has stated that the existence of a "[legitimate] prison disciplinary report is highly probative, if not dispositive, of whether a defendant acts with a retaliatory animus." <u>Rankin v. Pearson</u>, 2013 WL 1305517, at *6 (S.D. Miss. Mar. 26, 2013), <u>aff'd</u>, 612 F. App'x 204 (5th Cir. 2015) (citing <u>Woods</u>, 60 F.3d at 1166); <u>accord Reese v. Skinner</u>, 322 F. App'x 381, 383–84 (5th Cir. 2009). The record of Young's conviction of disciplinary violations at Rayburn does not demonstrate "but for"

causation; instead, it demonstrates that [defendants] had a reasonable, non-retaliatory motivation for charging Young with the violations. <u>Walker</u>, 2016 WL 4151212, at *6 (quotation omitted) (citing <u>McDonald</u>, 132 F.3d at 231).

Accordingly, his retaliation claim is legally frivolous and fails to state a claim upon which relief can be granted under Section 1983.

(D)    <u>EQUAL PROTECTION CLAIM</u>

Plaintiff claims that his placement in disciplinary segregation violates the Equal Protection Clause of the Fourteenth Amendment. Record Doc. No. 1 at p. 9. "To state an equal protection claim, [plaintiff] must allege, inter alia, that <u>similarly situated individuals</u> have been treated differently and he must also allege purposeful or intentional discrimination." <u>McKnight v. Eason</u>, 227 F. App'x 356, 357 (5th Cir. 2007) (citation omitted) (emphasis added); <u>accord</u> <u>Baranowski v. Hart</u>, 486 F.3d 112, 123 (5th Cir. 2007). Young's claims seem to be only that prisoners in general population and extended lockdown are treated differently. However, "[s]uch claims fail to implicate the Equal Protection Clause because prisoners in different levels of administrative segregations or classifications are not similarly situated." <u>Ruiz v. LeBlanc</u>, 643 F. App'x 358, 364 (5th Cir. 2016) (citing <u>Martin v. Scott</u>, 156 F.3d 578, 580 (5th Cir.1998)). Accordingly, to whatever extent plaintiff alleges equal protection claims, such claims must be dismissed.

(E)    <u>PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Plaintiff has filed a motion for a temporary restraining order and preliminary injunction in this matter. Record Doc. No. 10. In his motion, Young reiterates his claims of false disciplinary charges and retaliation. He asks the court to order his release from extended lockdown and reverse his conviction for the disciplinary charges because he will potentially suffer "mental harm" and have to stay in prison longer. Id. at p. 5.

According to Rule 65(b) of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must set forth "specific facts in an affidavit or a verified complaint" that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant." A preliminary injunction is an extraordinary equitable remedy that may be granted only if plaintiff clearly carries his burden of establishing four essential elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that he will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause defendants; and (4) the injunction will not disserve the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Jackson Women's Health Org. v. Currier, 760 F.3d 448, 452 (5th Cir. 2014); Voting for Am. Inc. v. Steen, 732 F.3d 382, 386 (5th Cir. 2013); Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs, 692 F.3d 343, 348 (5th Cir. 2012); S. Co. v. Dauben Inc., 324 F. App'x 309, 314 (5th Cir. 2009). Part of the requisite showing is "a substantial threat of irreparable injury if the injunction is not issued." DSC Commc'ns Corp. v. OGI Techs., Inc., 81 F.3d 597, 600 (5th Cir. 1996) (emphasis added); accord S. Co., 324 F. App'x at 319.

Applying the foregoing legal standards to the facts alleged in plaintiff's written submissions and testimony and the overall record establish that Young is <u>not</u> entitled to preliminary injunctive relief. First, a hearing has been held pursuant to <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and I have recommended that plaintiff's complaint be dismissed in its entirety for all the reasons set out in this report. Thus, it cannot be concluded that the complaint presents "a substantial likelihood of success on the merits." <u>Pharm. Research & Mfrs. v. Walsh</u>, 538 U.S. 644, 662 (2003) (citation omitted); <u>DSC Commc'ns Corp.</u>, 81 F.3d at 600.

Second, Young has not established that he faces a substantial threat of serious injury that would be irreparable. His testimony and written allegations establish no constitutional violation for the reasons discussed above and therefore no constitutional injury that would be irreparable. "<u>Speculative</u> injury is not sufficient," and only "a <u>strong</u> threat of irreparable injury before trial" will serve as an adequate basis for preliminary injunctive relief 11A C. Wright, A. Miller, et al., <u>Federal Practice and Procedure</u> § 2948.1, text at nn. 9, 12 (3d ed., available on Westlaw) (emphasis added). Although, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," <u>id.</u> text at n.26. Young has failed to establish any such constitutional violation, all as discussed above. Thus, the second factor also weighs against granting his motion.

Finally, the third and fourth factors – (a) balancing of the threatened injury against any damage it might cause to defendants and (b) the public interest – are related in this instance.

I find that defendants' interests and the damage they may suffer by entry of the sort of court order sought by Young would involve this court's unwarranted interference with the administration of prison functions, including the maintenance of security and jailhouse discipline and appropriate custodial classification, in a way that would disserve the public interest. Courts must accord great deference to prison officials' administrative decisions and will not interfere with legitimate administration, including especially the "essential goals" of "maintaining institutional security and preserving internal order and discipline," in the absence of a constitutional violation. Bell, 441 U.S. at 546–48; accord Alexander v. Neustrom, 2016 WL 4626604, at *5 (W.D. La. Sept. 6, 2016) (citing Smith v. Bingham, 914 F.2d 740, 742 (5th Cir. 1990)). State officials have broad discretionary authority concerning the placement of prisoners in a particular status and in the maintenance of prison discipline. Under the circumstances described by Young, he has no constitutionally protected interest that might outweigh defendants' or the public's interests in prison administration and discipline.

Accordingly, Young has not established the four factors necessary to obtain preliminary injunctive relief. On balance, all four factors weigh in favor of denying plaintiff's motion.

(F)    PLAINTIFF MAKES NO CLAIM AGAINST BICKHAM AND TANNER FOR MONETARY DAMAGES

In their motion to dismiss, defendants argue that Bickham and Tanner are immune in their official capacities for plaintiff's claims for monetary damages against them. Record

Doc. No. 34-1 at p. 2. However, plaintiff does not assert claims for monetary damages against these defendants. Record Doc. Nos. 1 (Complaint at ¶ V); 44 at p. 2. Thus, defendants' motion to dismiss for lack of subject matter jurisdiction must be denied.

(G)　　PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

(1)　　STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Id. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery and any affidavits supporting the conclusion that there is no genuine issue of material fact. Id. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. Id. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. Id. Material facts are not genuinely

disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Equal Emp't Opportunity Comm'n v. Simbaki, Ltd., 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. See Anderson, 477 U.S. at 249–50; Hopper v. Frank, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398–99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. See Tolan v. Cotton, 572 U.S. 650, 656 (2014); Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. See Lynch Props., Inc. v. Potomac Ins. Co. of Ill., 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. When the

nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. See Celotex, 477 U.S. at 322–25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. See Little, 37 F.3d at 1075–76.

(2)     THE PARTIES' ARGUMENTS

Plaintiff has moved for summary judgment in this case. Record Doc. Nos. 27. Likewise, defendant LeBlanc argues that summary judgment should be granted in his favor. Record Doc. No. 26 at p. 1, n. 1 (citing Fed. R. Civ. P. 56(f); Foley v. Cain, 2015 WL 1526455, at *1 (M.D. La. Apr. 3, 2015) ("When the plaintiff has moved for summary judgment and the record developed on the plaintiff's motion reveals that the defendants are entitled to summary judgment, the court has discretion to grant summary judgment to the defendants even though no formal motion has been filed."); NL Industries v. GHR Energy Corp., 940 F.2d 957 (5th Cir.1991); Arkwright Boston Mfgs. Mutual Ins. Co. v. Aries Marine Corp., 932 F.2d 442 (5th Cir.1991); Marriott Brothers v. Gage, 911 F.2d 1105 (5th Cir.1990)). Accordingly, I will treat defendant's opposition as a motion for summary judgment. Plaintiff filed a written response to defendants' opposition. Record Doc. No. 38. I have considered this response, together with his complaint and his other written submissions in support of his claim; and his sworn testimony provided pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

In his motion for summary judgment, plaintiff argues that there is no genuine dispute as to any material fact. Record Doc. No. 27-1. Plaintiff argues that it is undisputed that (1) defendants Crawford and Sheridan found plaintiff guilty even when they found no evidence to convict him; (2) defendants Crawford and Sheridan demonstrated that they were not impartial decision-makers when they stated on record that plaintiff's defense was inadequate despite the lack of camera footage; (3) the reporting officer never gave any location on the report or otherwise as to where the incident took place, and never made any statement concerning the incident "happening outside;" (4) the reporting officer was fired before plaintiff's appeal was investigated; (5) if defendant Johnson had not lied and given false statements about the incident, Luper would not have upheld plaintiff's disciplinary conviction; (6) Luper never told LeBlanc that the reporting officer had been fired and never made any statements about the incident; (7) plaintiff never received and was not convicted of a rule 24 (unauthorized area) violation concerning this incident; (8) defendants have no evidence that plaintiff ever had contact with the reporting officer. Record Doc. No. 27-1 at pp. 1–2. Plaintiff reasserts arguments made in his complaint and expounded upon in his Spears hearing, and argues that the evidence attached to his motion demonstrates that he is entitled to summary judgment. Record Doc. No. 27-2 at pp. 5–8. He also makes several arguments which appear unrelated to the claims he makes in his complaint.[4] Id. at pp. 1–3. Young's motion is supported by correspondence between plaintiff and jail officials, as well

---

[4] Similar to the claims mentioned above in his declaration, plaintiff has not moved to amend his complaint to add these unrelated claims. Plaintiff may move to amend his complaint or file a new lawsuit, at his option, to assert these claims.

64

as disciplinary reports, all of which appear to be unrelated to the claims in the instant case. Record Doc. No. 27-3 at pp. 1–24.

In his opposition memorandum, LeBlanc argues that plaintiff's motion for summary judgment should be denied because plaintiff's statement of undisputed facts is unsupported and because his complaint against LeBlanc for denying his disciplinary appeal is frivolous and should be dismissed. Record Doc. No. 26 at p. 4. Defendant argues that he should be entitled to summary judgment because plaintiff failed to exhaust his administrative remedies; he is not entitled to monetary damages under 28 U.S.C. § 1997e(e) because he has not alleged a physical injury as to any of his claims; his claim of false disciplinary charges resulting in his placement in disciplinary segregation does not constitute a constitutional violation; his claims regarding the conditions of his confinement in disciplinary segregation are legally frivolous; defendant is entitled to qualified immunity from damages in his individual capacity; there is no supervisory liability under Section 1983 and plaintiff has no constitutional right to have grievances resolved to his satisfaction. Record Doc. No. 26 at pp. 1–17. Defendant attaches a statement of undisputed facts; namely, that (1) on August 31, 2019, Appeal RCC-2019-246 was denied; and (2) ARP #RCC-2019-488 was received on August 28, 2019 and rejected on August 30, 2019. Record Doc. No. 26-1 at p. 1.

In support of his motion, defendant points to Record Doc. No. 1-1 at p. 2 (plaintiff's Exhibit B) and attaches an Administrative Remedy Procedure and Property Claims form demonstrating that Young's ARP was rejected by defendant Bickham because "Disciplinary matters are not appealable through the Administrative Remedy Procedure." Record Doc. No.

26-2 at pp. 1–3. Also attached is a letter from Young that apparently accompanied his ARP, in which he requested that Warden Tanner, Col[onel] Luper and Captain Johnson be fired because they "worked together and lied on a disciplinary appeal just to lock me in extended lockdown. The reporting officer had already been fired for being a criminal so Warden Tanner and . . . Luper used Captain Johnson to lie on behalf of the ex[-]officer about a[n] incident that never happened. Captain Johnson had no part in the incident and the camera is not clear as to who was in the video." Id. at p. 4.

In his response to defendant's motion, plaintiff reasserts that the allegations in his complaint and the above facts cannot be disputed by defendants. Record Doc. No. 38 at pp. 1–3. In support of this argument, plaintiff points to his complaint and the exhibits attached to it. Id. As to defendant's argument that plaintiff failed to exhaust his administrative remedies, plaintiff argues that he was told by Cynthia Crain, who he identifies as Administrative Program Specialist C, the ARP Screening Officer and Warden Tanner's secretary, that if he was not satisfied with the rejection of his ARP, he could file suit in federal district court. Record Doc. No. 38 at p. 4. He attaches a letter from Crain, dated February 4, 2020, in support of this argument. Record Doc. No. 38-1 at p. 1.[5] Plaintiff argues that because he could not appeal the disciplinary conviction, he exhausted all administrative remedies. Id.

Plaintiff argues that he never asserted an Eighth Amendment violation, but rather that the conditions of which he complained were the result of his false disciplinary conviction and

---

[5] This letter does not identify the specific ARP to which Crain is referring.

placement in lockdown. Id. at pp. 5–6.[6] As to his claim of disciplinary segregation, Young asserts that his placement in disciplinary lockdown infringed upon a constitutionally protected liberty interest. Id. at pp. 6–7. Specifically, as noted above, Young claims that in order to be eligible for parole, he "must be 12 months write up free before the parole board can grant parole," and his inability to attend parole hearings despite being "a year write[-]up free" deprived him of a constitutionally protected liberty interest. Id. at p. 7. Plaintiff argues that defendant LeBlanc is not entitled to qualified immunity because LeBlanc's actions were in violation of Young's clearly established constitutional rights. Id. at pp. 8-23. Specifically, plaintiff argues that LeBlanc refused and failed to correct due process violations in the prison discipline process that were obvious on the face of the administrative record, the prison recording and plaintiff's appeal. Id. at pp. 17–20.

Applying the foregoing standards, and considering the entire record, including plaintiff's Spears testimony, his complaint, its attachments and his written submissions, I find that Young has fallen well short of submitting evidence sufficient to establish a set of **un**contested material facts on which it can be concluded as an undisputed matter that plaintiff is entitled to judgment in his favor as a matter of law. Even assuming that the alleged "facts" listed above were supported by sufficient evidence, which they are not, none of them supports a conclusion that plaitniff is legally entitled to judgment. A party who seeks

---

[6] Plaintiff apparently fails to recognize that, broadly construed, his complaint contains conditions of confinement claims, which are analyzed under the Eighth Amendment for such claims by convicted prisoners such as himself. To the extent plaintiff wishes to amend his complaint to withdraw such claims, such an amendment is unnecessary because I have recommended that the claims should be dismissed.

summary judgment in his favor must, among other things, be "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For all of the reasons set forth above, plaintiff is not. His motion for summary judgment, Record Doc. No. 27, must therefore be denied.

As to defendant's opposition, in which he asserts that he is entitled to summary judgment as to plaintiff's various claims, I have concluded above and recommended that plaintiff's claims against defendants must be dismissed as legally frivolous, for failure to state a claim and/or under Heck. Accordingly, it is unnecessary to address LeBlanc's request that summary judgment should be entered in his favor. Defendant's LeBlanc's requests for summary judgment should be dismissed without prejudice.

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's motions for a temporary restraining order and a preliminary injunction and for summary judgment, Record Doc. Nos. 10 and 27, should be **DENIED**; that defendants' motion to dismiss for lack of subject matter jurisdiction and/or for failure to state a claim, Record Doc. No. 34, should be **DENIED IN PART** as to subject matter jurisdiction and **GRANTED IN PART** as to failure to state a claim; that defendant LeBlanc's request for summary judgment, Record Doc. No. 26, should be **DISMISSED WITHOUT PREJUDICE**; and that plaintiff's complaint as a whole against all defendants should be **DISMISSED WITH PREJUDICE** under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as legally frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony

explaining the factual basis of his claims, or pursuant to Heck v. Humphrey, 512 U.S. 477 (1994), all for the following reasons.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[7]

New Orleans, Louisiana, this _____7th_____ day of May, 2020.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[7] Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

69